## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | |
| | **:** | **No. 19-cr-361 (BAH)** |
| **JAMES HUNTER HUTCHINGS JR,** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

### GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in support of its motion for pretrial detention of defendant James Hunter Hutchings Jr. / II (the "defendant"). The government requests that the following points and authorities, as well as any other facts, arguments, and authorities presented at the detention hearing, be considered in the Court's determination regarding pretrial detention.

### Introduction

The defendant has been charged by indictment alleging one count of Conspiracy, pursuant to 18 U.S.C. § 371. The indictment specifies that the defendant, along with another individual named Kofi Appiah[1], conspired to violate multiple provisions of 18 U.S.C. § 922, including conspiring to sell or transfer firearms to out of state persons, in violation of §922(a)(5), conspiring to sell firearms as a dealer without a license, in violation of §922(a)(1)(A), and conspiring to sell to and receive firearms by a person previously convicted of a crime punishable by a term of imprisonment exceeding one year, in violation of §922(g)(1). Based on the defendant's conduct and characteristics, the government respectfully requests that the Court hold him without bond

---

[1] Appiah has been arrested and arraigned in the Middle District of Georgia.

pending trial to ensure the safety of the community.

## Procedural History and Applicable Authority

At his initial appearance on October 29, 2019, the government orally moved for detention pending trial pursuant to 18 U.S.C. §§ 3142(f)(1)(E). The Court scheduled a detention hearing for November 1, 2019.

The government contends that the defendant is a danger to the community and should be held prior to trial. The government must establish this by clear and convincing evidence. *United States v. Peralta*, 849 F.2d 625, 626 (D.C. Cir. 1988). Section 3142(g) provides four factors the Court should consider in determining whether to detain the defendant pending trial: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the defendant's history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. *See* 18 U.S.C. § 3142(g). Application of these factors demonstrate that no condition, or combinations of conditions, short of detention will ensure the safety of the community. Thus, the defendant should be held.

## Nature and Circumstances of the Offenses Charged

For purposes of completeness, the government summarizes the entire investigation below. The defendant's role becomes prominent on page 8.

### Initial Investigation

On December 19, 2018, an investigation conducted by the Federal Bureau of Investigation's ("FBI") Safe Streets Task Force led to a search warrant executed at 4215 Foote Street Northeast, Washington, D.C. On that date, law enforcement recovered approximately 44 kilograms of heroin laced with fentanyl, 50 lbs. of marijuana, and six firearms. An individual named Linwood Douglas Thorne was arrested in connection with this incident. His case is

currently pending before Chief Judge Beryl A. Howell, and scheduled for jury trial on December 9, 2019 (18-cr-389). Thorne is a major narcotics supplier and a previously convicted felon.

On February 11, 2019, investigators reviewed ATF Firearms Trace Summaries regarding a Glock 43, 9mm pistol bearing serial number BHYH954; a Glock 19, 9mm pistol bearing serial number BGWF289; and a Glock 19, 9mm pistol bearing serial number BGZT454, all of which were recovered at 4215 Foote Street. Law enforcement learned that, of those three firearms, two of them were originally purchased by a man named Kofi Appiah. Law enforcement identified Appiah as a second lieutenant in the United States Army, stationed in Fort Benning, Georgia, with addresses in Columbus, Georgia (his primary residence), Temple Hills, Maryland (his parents' address), and Washington, D.C. (his girlfriend's address).

The trace summaries associated with the recovered firearms indicated that the three firearms in question were purchased on December 6, 2018 and September 4, 2018. Specifically, on December 6, 2018, Appiah and a third person purchased multiple firearms at a firearms dealer in Columbus, Georgia, and within thirteen days, some of those firearms ended up in the residence of Thorne, a major heroin trafficker in the D.C. area. The Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") began an investigation into how and why the firearms migrated so quickly.

*Interviews of the Purchasers*

Law enforcement tracked down Appiah and the third-party purchaser, meeting both of them at Fort Benning, where they were both stationed as military officers. Prior to interviewing them, agents spoke with their commander, who indicated that Appiah was not authorized to travel to the District of Columbia in December of 2018. The commander also indicated that Appiah had behavioral difficulties and would likely be removed from his position from within the military.

On February 21, 2019, law enforcement interviewed Appiah and the third party. In summary, Appiah and the third party admitted to conducting a straw purchase on December 6, 2018. Specifically, Appiah asked the third party to come to the gun store where he was located and help to purchase some additional firearms for him. Appiah lied throughout the interview, claiming to never having had sold firearms, and was unwilling to provide additional details regarding the whereabouts of his firearms. Notably, although law enforcement was trying to ascertain the location of approximately thirteen purchased firearms, Appiah admitted to having had purchased approximately twenty firearms.

With respect to the firearms found at Thorne's residence, agents finally addressed how Appiah's firearms got transported to the District of Columbia, especially so quickly. Appiah said that he asked an acquaintance named "Bo," who was visiting Atlanta, to help him move four of his firearms and other belongings back to D.C. Appiah described "Bo" as an older, black male, approximately 5'10", bald, approximately 45 years old in age.[2] Furthermore, Appiah said "Bo" is known to sell narcotics and is a "big transporter." Appiah said he had not spoken to "Bo" since the four firearms were transferred to him. Appiah stated that he did not have any contact information for "Bo" either and claimed "Bo" was the "type of guy to move around." Appiah told agents he heard "Bo" was "locked up."

When asked whether he knew any specifics about the recovery of his firearms, Appiah said he did not know. Agents pressed Appiah, accusing him of lying (and reminding him that it was unlawful to lie to federal agents). Appiah replied, "I sent Bo up to D.C. with more guns than what

---

[2] Law enforcement initially believed "Bo" was Thorne because Thorne fits a similar description. Coincidentally, the defendant also fits that description, except that the defendant is 38 years old, as opposed to his mid-forties. In prior search warrant affidavits related to this case, the defendant was erroneously described as being in his mid-forties. Regardless, both Thorne and the defendant look similar.

was in the news clip." When asked what news clip he was referring to, Appiah stated, "A D.C. news clip." When asked who sent him the news clip, Appiah stated, "An unknown number." Appiah said he kept the news clip but could not identify the cell phone sender of the news clip. Agents learned that the news article Appiah was referring to was published on or about January 7, 2019. The article reported the seizure of multiple firearms and 2.5 million dollars' worth of heroin from Thorne's residence. Notably, the article did not mention the name Appiah, the name "Bo," the defendant, the make or model of the recovered firearms, or anything connecting the seized firearms to Appiah. Thus, agents asked Appiah how he knew the news article related to him. Appiah stated, "I know that I have Glocks." One of the agents explained that a Glock pistol is an extremely common firearm, making it odd that Appiah connected the news article directly to him simply because of the make and model of the recovered guns (which, again, were not mentioned in the article).

Appiah said he expected law enforcement to approach him because the serial numbers on the pistols would come back to him. When confronted again about inconsistencies in his story, Appiah admitted that he initially was not forthcoming with them about knowing the details of the search warrant because he did not want to divulge too much information, as he felt it was not his business.

When asked how much he sold the firearms to "Bo" for, Appiah said he did not sell his firearms but he admitted that he previously advertised his services as a potential straw purchaser to people in the Washington, D.C. area. Appiah said that he told people on social media, including "Bo" and his affiliates, that if they gave him money, he would be able to purchase firearms on their behalf. According to Appiah, he never got the opportunity to purchase firearms for "Bo" or other acquaintances. Appiah said he does not know where to find "Bo's" affiliates, but he knows they

live around Northeast, Washington, D.C. Appiah then stated he lived on E Street himself but did not associate with anyone in the neighborhood.

When confronted regarding agents' belief that Appiah was trafficking firearms, Appiah again told them that it did not make sense to traffic personally purchased firearms. Appiah said if he were to illegally purchase firearms for other people, he would simply obliterate the serial numbers. Agents continued to press Appiah about "Bo." Appiah confirmed that "Bo" was known for selling marijuana and crack cocaine. He said "Bo" had multiple phones but he was unable to confirm a real name or a phone number for him. Appiah said he never bought firearms in Georgia and sold them in Washington, D.C. Although Appiah admitted to advertising firearms prices on his social media pages, he claimed that he never sold any firearms. Appiah told agents that he owned approximately twenty firearms. When asked if he was in possession of all the firearms, minus the four he gave to "Bo," Appiah said he had some firearms in his current apartment but the rest were stored in Maryland and Washington, D.C.

ATF spent several months trying to verify the whereabouts of Appiah's firearms, to no avail.

### Analysis of Appiah's Cell-Site Data

On May 9, 2019, law enforcement obtained judicial authorization to obtain Appiah's cell-site data pertaining to his telephone number (19-sc-1017 (GMH)). On May 29, 2019, ATF's Intelligence Research Specialists discovered that Appiah's cell-site data showed that the number associated with Appiah's phone traveled from Atlanta, Georgia to Arlington, Virginia on December 7, 2018. The data revealed that hours after the firearms were purchased in Georgia, the number associated with Appiah departed Atlanta, arrived in Arlington, Virginia, and stayed in the Washington, D.C. area until December 9, 2018 when the number associated with Appiah returned

back to Georgia. ATF confirmed with Delta Airlines that Appiah traveled to Washington, D.C. via airplane on December 7, 2018, returning two days later on December 9, 2018. Moreover, in his flight to Washington, D.C. Reagan National Airport in Arlington, Virginia, Delta confirmed that Appiah brought "shooting equipment" with him. When Appiah returned two days later, however, Appiah had no such baggage with him.

This travel information is inconsistent with Appiah's previous account that he traveled to Washington, D.C. around December 21, 2018. Moreover, the cell-site data showed that the number associated with Appiah not only connected to towers in the Washington, D.C. area, but specifically to towers close in proximity (a little over one mile) from 4215 Foote St. N.E., Thorne's residence and the site of executed search warrant where Appiah's firearms were recovered. Appiah's number also connected to a tower close in proximity (a little over one mile) to Thorne's auto-body business, located miles away in Clinton, Maryland.

*Third Interview of Appiah during Search of his Cellphone*

On June 12, 2019, investigators interviewed Appiah at Fort Benning Army Base, located in Fort Benning, Georgia. On that date, investigators served him with a search and seizure warrant that was obtained in the Middle District of Georgia for his cell phone. While agents downloaded the cell phone, Appiah and agents continued to talk. Appiah initially told agents he did not want to talk about his first interview because he knew it was recorded; therefore, he had no further commentary. Appiah stated that he did not want to cooperate with law enforcement any further than he had to, but he agreed to answer specific questions. Agents asked Appiah if he ever visited any locations near Foote Street, N.E., Washington, D.C. Appiah stated that he drove near Foote Street frequently but since this investigation started, he has stayed away from that area. When asked if he has specifically visited 4215 Foote Street, N.E., Appiah said no. Appiah said he knew

the area well and vividly described the cross streets in that area. When asked if he frequented the Clinton, Maryland area, Appiah emphatically stated yes. Appiah told agents that he has friends and family in the Clinton area who he visited frequently. Appiah named multiple businesses in the Clinton area that he visits. Appiah also stated that his mother owned a church in Clinton.

When asked how often he flew to Washington, D.C., Appiah stated approximately every two weeks. When asked if he checked firearms in his luggage when he flew into Washington, D.C., Appiah said he declared firearms in his luggage approximately 80 percent of the time. Appiah said he transported firearms to Washington, D.C. because he was leaving the military and wanted to have his firearms in D.C. by the time his separation from the Army was completed.

Agents asked Appiah where his firearms were located. Appiah said he got scared when agents interviewed him the first time; therefore, he asked his friends to destroy and throw his firearms away.

When asked if he would be willing to provide further information regarding the whereabouts of "Bo" and the investigation surrounding the recovery of his firearms during the December 19, 2018 search warrant, Appiah said he did not have any further information to give. Appiah also spontaneously stated, "Rats should be exterminated." Appiah told agents that he did nothing wrong but was willing to accept the consequences for his actions.

*Review of Appiah's Cell Phone Content*

On his cell phone, agents discovered multiple conversations highlighting firearms trafficking. His cell phone also contained multiple photographs of various firearms. But there was nothing on the cell phone relating to the trafficking of firearms in December of 2018 or referencing the news article publicizing Thorne's arrest and the narcotics seizure. Given that agents had previously observed the news article on Appiah's phone after his first interview on February 21,

2019, law enforcement thus had reason to believe that Appiah had deleted some messages or records from the phone.

<em>The Defendant and his Connection to the Crime</em>

At this stage in the investigation, it was apparent that Appiah had sold firearms and that some of Appiah's firearms quickly moved from Georgia into the District of Columbia in a very short period of time in December of 2018. But agents initially could not ascertain the link between Appiah and Thorne. Agents conducting the Appiah investigation consulted with agents working the Thorne investigation. The Thorne case agents informed ATF that when Linwood Thorne was apprehended—on January 3, 2019—he was found inside of an apartment off Linden Avenue in Baltimore, Maryland. Prior to Thorne's apprehension, agents encountered the defendant and another individual, who just happened to be walking away from that same apartment. The individual walking with the defendant told law enforcement that Thorne could be found in the apartment. At the time, the defendant had not done anything wrong, so agents had no reason to detain the defendant. When Thorne was arrested, he was found in the apartment by himself, along with four cell phones in close proximity.

On July 5, 2019, the Thorne case agents alerted ATF that, pursuant to a search warrant, agents had obtained access to one of the phones found in the apartment with Linwood Thorne during his arrest on January 3, 2019. Based on the contents of the phone and identifiers throughout the phone, that phone belonged to the defendant.

<em>Review of the Defendant's Cell Phone</em>

In the phone, agents learned of extensive contact between the defendant and Appiah. Specifically, agents discovered that at approximately 1:05 a.m. on December 6, 2018, a payment of $430.00 was made to "DMVBabyboi" (associated with Appiah) through a financial transaction

mobile app called CashApp. The CashApp payment to Appiah was completed on the same day that Appiah purchased two Glock pistols which were later recovered in Washington, D.C during the December 19, 2018 search warrant. Investigators identified numerous pictures in Appiah's cell phone with the same "DMVBabyboi" CashApp username. Finally, agents discovered dozens of text messages highlighting firearms trafficking between the defendant and Appiah.

For example, at 12:38 p.m. on November 13, 2018, Appiah sent the defendant the same photographs found on Appiah's cellphone of a Ruger .38 revolver and an AR-15 style rifle. Two days later, at 2:33 p.m. on November 15, 2018, the defendant texted Appiah, "I'm in Atlanta bro. I need some of them." Appiah responded, "I wont have anything else for this month. Next month is a go. Once they come in they go just as fast." The defendant then replied, "Nigga I need them put me in rotation" and Appiah responded, "Aight. I told you just tell me ahead of time when you coming." The defendant then wrote, "I will be here next month to pick up my order." Appiah then advised the defendant that he did not have anything else for the current month, but would notify the defendant once he had more firearms next month. The defendant then acknowledged he would be there next month to pick up his order.

On November 30, 2018 at 11:56 a.m., Appiah sent the defendant a photograph via text message of a ledger that investigators believe to depict the current inventory and prices of various Glock model handguns, ammo drums, extended round magazines and an AR-15 style rifle that Appiah had available to sell to the defendant.

*The ledger text message*

A few hours later, at 2:56 p.m., Appiah texted the defendant a screen shot photograph of his CashApp account listed as Kofi Appiah - $DMVBabyBoi. At 4:31 p.m., the defendant sent Appiah a photograph showing that $1,500 had been sent via CashApp to Appiah. Appiah then responded via text message, "Got it," thereby acknowledging that he received the $1,500 payment from the defendant. The next day, on December 1, 2018, at 6:14 p.m., the defendant sent Appiah another photograph showing that $410 was sent to Appiah's CashApp account. Again, on December 3, 2018, at 1:49 p.m., the defendant sent a screen shot photograph that showed $310 was sent to Appiah's CashApp account. Appiah responded, "Got you" and the defendant replied, "Thank you bro I'm going to keep sending money as it come in on my end."

On December 4, 2018, at 4:34 p.m., Appiah sent the defendant a text that read, "These are the 23's," followed by a photograph of two Glock model 23 pistols, each lying in the gun box with two magazines. The defendant replied, "Ok bet I just sent to bro try to send some more bread tonight." Appiah replied, "ok bet." On December 5, 2018 at 1:12 p.m., Appiah texted the defendant, "Tomorrow is the last day I'll be able to get anything to bring back on Friday. And I a

lot more to get." The defendant replied, "Ok cool going to send another 300 tonight and try to send the [remainder] tomorrow." On December 6, 2018, at 1:06 a.m., the defendant sent Appiah another screenshot photograph showing that he made a $430 payment to Appiah's CashApp account. The defendant also wrote, "Bet I'm going to try to send the balance tomorrow." Appiah then wrote. "Cool. We linking up Friday or Saturday." The defendant replied, "Friday if possible" and Appiah wrote, "Bet." On December 7, 2018, at 12:42 a.m., the defendant sent Appiah a text that read, "Didn't get no money today however I definitely have the balance tomorrow in your account or when I see you." On this same day, at around 9:40 a.m., Appiah flew from Atlanta to Washington, D.C.

In addition to the text messages, the defendant also searched on google whether law enforcement could obtain images off of a cell phone.

| 24828 | Searched Items | | | 12/5/2018 12:25:26 AM(UTC-5) | | can fbi get images off cellphone |
| 24829 | Web History | | | 12/5/2018 12:25:26 AM(UTC-5) [Last Visited] | | can fbi get images off cellphone - Google Search |
| 24830 | Searched Items | | | 12/5/2018 12:25:26 AM(UTC-5) | | can fbi get images off cellphone |
| 24831 | Web History | | | 12/5/2018 12:25:31 AM(UTC-5) [Last Visited] | | can fbi get images off cell phone - Google Search |
| 24832 | Searched Items | | | 12/5/2018 12:25:31 AM(UTC-5) | | can fbi get images off cell phone |

*The google search*

*The Defendant's GPS Data*

Within the defendant's cell phone, the phone itself contained geolocation data pertaining to the phone's whereabouts during various activations when the phone was in operation. For example, on December 8, 2018, the phone pinged in close proximity to Appiah's parents' residence in Temple Hills, Maryland. On December 11, 2018—after Appiah had returned back to Georgia— the defendant's phone pinged within blocks of the Temple Hills residence.

Similarly, the phone pinged near locations relevant to Linwood Thorne. For example, on December 9, 2018—the same day Appiah returned back to Georgia—the defendant's phone was within blocks of Thorne's residence at 4215 Foote St N.E., Washington, D.C.



On December 11, 2018, within an hour or so after the defendant texted Appiah, "Thank you bro I'm going see big bro in about the next hour or so," the defendant's phone pinged within blocks of Thorne's auto-body business (called "Dou Perfect") in Clinton, MD.



Finally, on December 17, 2018, the defendant's phone pinged again within a mile of Thorne's residence off Foote St N.E.

The defendant's phone had Thorne's telephone number listed in his phone as "Fam Unc." The phone had extensive communication with Thorne via WhatsApp, telephone calls, and Facetime, including on November 20, 2018, and December 16-18, 2018.

Finally, as the defendant himself has been previously convicted of multiple narcotics-related felony offenses, the defendant is a prohibited person pursuant to 18 U.S.C. § 922(g)(1) and cannot possess or receive firearms.

The nature and circumstances of this case involve the transfer and sale of multiple firearms from Appiah in Georgia to the defendant. The defendant acted as a courier in the transfer, paying Appiah for the firearms and transferring them to Thorne, who resided in the District of Columbia. Of the four guns allegedly provided by Appiah to "Bo," three of them almost immediately ended up in Thorne's residence, along with a significant amount of narcotics and drug paraphernalia. The connection between Appiah and Thorne is the defendant. In sum, the defendant, a prohibited person himself, acted as the vessel that enabled these firearms to end up in the hands of Thorne,

also a prohibited person and a high-level narcotics trafficker in the D.C. area. The aggravating factors of this case—the distribution of firearms, interstate, between a military lieutenant and multiple prohibited persons—should raise serious concern as to the danger that the defendant represents. This factor weighs in favor of detention.

## Weight of the Evidence Against the Defendant

The second factor to be considered, the weight of the evidence, also weighs heavily in favor of detention. The evidence against the defendant, albeit circumstantial, is overwhelming. The defendant's cell phone, his GPS data, and the circumstances and timing of the December 19, 2018 search warrant make it abundantly clear that Appiah flew up to Washington, D.C. with firearms, and transferred them to the defendant, who subsequently met with Thorne both near his residence in Washington, D.C. and at his business in Clinton, Maryland, to provide the weapons to him. But for the defendant's agreement to purchase firearms from Appiah, those firearms would have never ended up in Thorne's possession or in the District of Columbia.

## The Defendant's History and Characteristics

There are several aspects of the defendant's history and characteristics that should raise red flags. *First*, his criminal history is extensive. *Second*, his connection to this area is worrying, particularly in light of his admissions to pretrial. *Third*, and perhaps most importantly, the defendant committed this offense while on active criminal justice supervision.

First, the defendant's criminal history is extensive. We have consolidated his bail sheet into the following table:

| Charge | Jurisdiction | Date | Sentence |
|---|---|---|---|
| Conspiracy to Violate Racketeering Provisions | Alexandria, VA | 07/31/2012 | 5 years / 4 years suspended |
| Distribution of Marijuana | Alexandria, VA | 07/31/2012 | 5 years / 5 years suspended |

| Drugs: Transport to Virginia 5+ Lbs. of Marijuana | Alexandria, VA | 07/31/2012 | 5 years / 2 years suspended |
|---|---|---|---|
| Money Laundering | Alexandria, VA | 07/31/2012 | 5 years / 5 years suspended |
| Marijuana and Paraphernalia Violation | Prescott, AZ | 11/12/2013 | 3.5 years and 1 year, respectively |
| False Statement to Police Officer | Prince George's County, MD | 04/17/2008 | 6 months' unsupervised probation |
| Possession of an Open Container of Alcohol | Washington, D.C. | 11/03/2005 | 20 days, all suspended |
| Reckless Driving | Washington, D.C. | 11/03/2005 | 45 days, all suspended |
| Sale/Distribute Marijuana (Felony) | Stafford County, VA | 04/08/2005 | 5 years / 5 years suspended |
| Uttering | Prince George's County, MD | 09/25/2003 | 1 year, all suspended |
| No Permit | Washington, D.C. | 08/16/2002 | 10 days, all suspended |

Thus, over the course of ten years, the defendant amassed a significant criminal history that runs the gamut of criminal offenses, including money laundering, transporting drugs, selling drugs, uttering checks, and lying to police officers.

The most concerning aspects of this criminal history involve the narcotics offenses in the Commonwealth of Virginia. We have obtained information related to the defendant's 2012 convictions out of Alexandria, Virginia.

The underlying statement of facts related to his 2012 is relatively complicated and involves multiple jurisdictions. The government has attached for reference, as Exhibit A, the Commonwealth's Opposition to the Defendant's Motion to Set Bail. Perhaps most notably, the defendant's prior conviction involved a cross-country marijuana distribution network worth hundreds of thousands of dollars, ultimately involving multiple undercover controlled deliveries by law enforcement. According to the opposition, "[l]aw enforcement officers have seized approximately 100 pounds of high-grade marijuana in this case, worth $400,000 to $500,000 in wholesale value in this case. Of course, this represents the proverbial 'tip of the iceberg.' With the financial records obtained in this case, at least another 100 pounds of marijuana can be

extrapolated." Moreover, according to the opposition, "[a]dministrative subpoenas obtained by the [DEA] show that the defendant is a frequent flyer. Since early 2011, the defendant has made over a dozen trips to Arizona, Las Vegas[,] and California. He has rented cars in his name over two dozen times in areas as divergent as Phoenix and Tucson, Arizona, Las Vegas, Nevada, Waldorf, Maryland, and Ontario, California." Finally, the same filing indicated that the defendant—at least in the past—used a sham-concert promotion business as a transparent cover for narcotics trafficking. This behavior, in conjunction with the rest of his criminal history, should give the Court great pause as to whether the defendant's behavior has really changed over time.

Second, the defendant's connections to this area are concerning. There is no question that the defendant has resided in the area for some time. According to law enforcement in this case, agents surveilled the defendant's residence in Waldorf, Maryland, as recent as early October of 2019. During that time, agents routinely saw the defendant or his vehicle outside of 3000 Gallery Place, where he lived with his long-term girlfriend. But on October 9, 2019, agents attempted to confirm the defendant's whereabouts by knocking on the apartment door, using a brief ruse so as to not divulge the real reasons law enforcement had knocked. Despite observing the defendant's vehicle parked outside of the apartment complex, the defendant's girlfriend (and mother of his three children) told police that the defendant did not live with her and that she only saw him when she brought her children to the defendant's mother's house for visitation with their father. She would not allow investigators to enter the apartment and would barely open the door for police. Coincidentally, records from the defendant's 2012 conviction also implicated the girlfriend in the marijuana distribution network scheme. Notwithstanding the girlfriend's insistence that the defendant did not live with her, a security guard for the apartment complex identified a photograph of the defendant and confirmed that the defendant lived with her and regularly came and went from

the apartment.

On the defendant's bail sheet, however, he listed his current address as 6470 Emerald Pointe Circle, Atlanta, Georgia. This is inconsistent with the information gathered by law enforcement and confirmed by the Waldorf apartment complex security guard. Moreover, according to the defendant, he has lived at that Atlanta address for approximately three years. This is even more concerning because undersigned counsel confirmed with pretrial that the defendant remains on active probation with the Commonwealth of Virginia and that his probation was transferred to Georgia (the same state where Appiah lived and had purchased the firearms in question). That the defendant is residing in a different state than where his probation lies greatly concerns the government, and this information suggests that the defendant has been not been truthful while under supervision.

According to the defendant's bail sheet, he is unemployed. But at his arraignment on October 29, 2019, through his counsel, he claimed to be the CEO of an incarcerated offender non-profit. While the government certainly appreciates his non-profit advocacy, should it be verified, the inconsistent information he provided to the Court and to the Pretrial Services Agency is troubling, particularly in light of the defendant's email address, prisonb4dishonor@gmail.com (which came from the defendant's recovered cell phone).

Third, the defendant's criminal history, his employment, and his residency can only be assessed through the prism of his active supervision. According to his 2012 Alexandria convictions, the defendant was placed on ten years of supervised probation after he was released from prison in approximately 2015. Although this offense carries with it a maximum penalty of five years of imprisonment, the defendant could face significant incarceration on the back end of his supervision. Moreover, the defendant appears to be on active supervision not only from his

2012 case, but also from his Stafford County case, where he placed was on *indefinite* probation. That he essentially violated probation in the most crucial way possible—picking up new convictions—should tell the Court all it needs to know about the defendant's intentions to comply in this case. The defendant committed this offense—a conspiracy to traffic deadly weapons—also while on supervision. There is nothing unique about this case that suggests that the defendant's willingness to violate the rules has abated.

Overall, the defendant's history and characteristics weigh in favor of detention.

### **Danger to the Community**

The fourth factor, the nature and seriousness of the danger to any person or the community posed by the defendant's release, also weighs strongly in favor of detention. Here, the defendant helped facilitate the illegal transfer of firearms to a dangerous narcotics trafficker. Despite being on probation for narcotics offenses, he willingly flaunted his responsibility to his community to ensure that another dangerous felon received firearms that could be used in narcotics trafficking.

This Court is well aware of the danger that firearms bring to this city. With the exception of 2012, since 1999, this city has had at least 100 homicides annually. As of October 29, 2019, the city has experienced 145 homicides, up 9% from 2018. Violent crime has increased by 1% to 3,477 incidents. According to the Metropolitan Police Department, more than 1,000 illegal firearms have been found by police this year, with 6,000 firearms confiscated in the past three years. Half of the people arrested on murder charges in the District in 2018 had a prior firearms arrest. In July of 2019, D.C. Mayor Muriel Bowser addressed the media on worsening gun violence, stating "[t]oo many times on those scenes, there's frequently the same question: 'How are these guns coming into our neighborhoods? We don't make guns in D.C. How are all of these guns on our streets?'"

In this case, the answer is clear: the defendant.

Given the above assessment of all four relevant factors, no condition, or combination of conditions, can ensure that the Defendant will comply with court order and abide by appropriate release conditions. Plainly put, this was such a flagrant violation of law that the Court simply cannot trust the defendant and he therefore should be held without bond.

## Conclusion

The Court should grant the government's motion to detain the defendant pending trial.

Respectfully Submitted,

JESSIE K. LIU
UNITED STATES ATTORNEY
D.C. Bar No. 472-845

By: _____/s/_____
GREGORY P. ROSEN
VA Bar No. 82584
Assistant United States Attorney
555 Fourth St. N.W.
Washington, D.C. 20530
(202) 252-6932
Gregory.rosen@usdoj.gov